SNOWDEN v. MARINE NAT. BANK OF PITTSBURGH, PA.

(Circuit Court of Appeals, Third Circuit. February 26, 1919.)

No. 2380.

BANKS AND BANKING ☞100—SALE OF STOCK FOR CUSTOMER—LIABILITY FOR
FRAUD OF CUSTOMER.

A bank *held* not liable in tort for the sale, for account of a customer, of
shares of stock owned by plaintiff, where plaintiff had indorsed the cer-
tificates in blank and forwarded them to the customer as a broker for
sale, and there was no evidence that the bank had knowledge or notice of
his ownership.

In Error to the District Court of the United States for the Western
District of Pennsylvania; Charles P. Orr, Judge.

Action at law by James H. Snowden against the Marine National
Bank of Pittsburgh, Pa. Judgment for defendant, and plaintiff brings
error. Affirmed.

Samuel S. Mehard, Mehard, Scully & Mehard, and Wm. E. Schoyer,
all of Pittsburgh, Pa., for plaintiff in error.

Hill Burgwin and H. & G. C. Burgwin, all of Pittsburgh, Pa., for
defendant in error.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and
THOMSON, District Judge.

BUFFINGTON, Circuit Judge.   In the court below, James H.
Snowden, a citizen of Connecticut, brought suit against the Marine
National Bank of Pittsburgh. On the trial the court, at the conclusion
of the plaintiff's proofs, granted defendant's motion for a compulsory
nonsuit. On its subsequent refusal to take off such nonsuit, plain-
tiff sued out this writ, and the question before us is whether the proofs
were such as justified submission of the case to the jury.

The action was trespass, and the statement charged a tort on the
bank's part. The tort consisted in the following facts, which are al-
leged in the statement:

That John L. Moore was engaged in business in Pittsburgh, Pa., as "a
mere promoter engaged in exploiting enterprises of doubtful value, notably
a company known as the Amber Oil Company, and that such transactions as
the sale of stock as said John L. Moore, individually, or as John L. Moore &
Co., may have been engaged in, were merely incidental to his said business as
promoter." That the business name of John L. Moore was John L. Moore &
Co., and "was assumed by said John L. Moore to mislead the public, in the
belief that another person or persons were engaged in said business beside the
said John L. Moore, and to thus unwarrantedly gain business faith and credit,
and in the course of such business said John L. Moore falsely and fraudulent-
ly held himself out as a stockbroker, and so advertised both in the public press
and by means of so-called "market letters," which he sent through the mails,
in large quantities, to many persons, in different parts of the country." That
certain correspondence and telegrams passed between Snowden and Moore in
reference to the sale of 200 shares of stock of the Union Mutual Gas Company,
which Snowden had placed in Moore's hands. That "these facts were well
known to the Marine National Bank, its officers and agents, in which and
through which said John L. Moore, as John L. Moore & Co., transacted his
banking business, as was also the fact that the wording used in the so-called

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

'confirmation of purchase' blanks used by John L. Moore & Co. was used with intent to evade legal responsibility for wrongful acts."

## The statement further averred:

That the bank, with knowledge or notice that the stock in question was Snowden's, and not Moore's, had it transferred to the name of Moore, and new certificates issued in Moore's name, and that such new certificates "were held by said bank until the same were sold and disposed of by said bank in co-operation with John L. Moore, trading as John L. Moore & Co.. October 19, 20, and 21, 1915, and the money received therefor was paid to the Marine National Bank, representing John L. Moore, trading as John L. Moore & Co., as aforesaid."

## The statement further averred:

The bank "well knew that John L. Moore, doing business in the name and style of John L. Moore & Co., was falsely and habitually holding himself out as a legitimate stockbroker."

## And it then charged:

"Specifically, plaintiff is informed, believes, and expects to be able to prove, and therefore avers, that the Marine National Bank, with full knowledge of the fact that the stock in suit was the property of James H. Snowden, and was in the possession of John L. Moore, or John L. Moore & Co., as broker or agent only, received same from John L. Moore and John L. Moore & Co. as the agent thereof, for the purpose of selling and disposing of same through the Stock Exchange of the City of Pittsburgh, for the account of James H. Snowden, the plaintiff herein, and to that end acted in collusion and co-operation with the said John L. Moore, trading as John L. Moore & Co., to the great loss and damage of the plaintiff herein."

## The statement further averred:

That "at the time of the transaction herein complained of * * * John L. Moore as an individual, or as John L. Moore & Co., was indebted to the Marine National Bank; * * * that for some time prior thereto the officers, agents, and employés of said bank were, as above stated, well aware of the material facts and circumstances herein set forth," and notwithstanding such was the fact, "unlawfully appropriated to itself the money received from the sale of the 50 shares of stock," for which Moore had given his check to plaintiff, which was not paid, and also "the proceeds of the remaining 50 shares of the stock of James H. Snowden, for which no check was ever sent, in payment of the debt owing to said bank by the said John L. Moore, trading as John L. Moore & Co., and that in truth and in fact the defendant herein, the Marine National Bank, caused the last 100 shares, represented by certificates Nos. 13,990 and 13,991, to be sold October 21, 1915, and wrongfully appropriated the entire proceeds thereof to its own use."

## It was further averred:

"That by reason of its wrongful and unlawful conversion of the proceeds of one lot of 50 shares of said stock and its unlawful sale, appropriation, and conversion of the other 50 shares of stock in co-operation and collusion with John L. Moore," the bank was indebted to the plaintiff in the sum claimed, and that "since his discovery of the facts and circumstances above set forth he has made demand, through his attorneys, upon the defendant for reimbursement in the premises, which demand has been by said defendant refused."

Based on this statement, the plaintiff brought this action of trespass. The Pennsylvania Procedure Act (P. L. 1887, p. 271), which is followed by the court below, provides for two forms of action, viz. assumpsit and trespass. Assumpsit is the proper form of action where there is

a contract, express or implied; trespass, the form to redress a tort or wrong. In the present case, the action is trespass, and the cause of action charged in the statement is the tort or illegal act of the bank. Such being the case, the test question is: Did the plaintiff's proofs show the bank guilty of a tort or tortious wrong done to John H. Snowden, the plaintiff?

The evidence shows that Snowden, on September 23, 1915, telegraphed John L. Moore & Co., stating his wish to sell 200 shares of Union Natural Gas stock at $132 per share, and inquiring whether they "can dispose of this for me at once." Having received, on September 27th, a favorable reply, Snowden wired Moore & Co. to sell the stock at once. at $132, and sent by registered letter, certificates which were in his name, and signed his name to the transfer in blank printed on the back of the certificates.

Acknowleding receipt of the certificates, Moore & Co., on September 28th, wrote Snowden:

"We are taking the matter up with some of our clients whom we know to be interested in this company, and we believe we can get you a little better price in this way than in the open market."

While there was an interchange of messages meanwhile, the next important step was on October 11th, when Moore & Co., wrote Snowden, informing him they had themselves bought 50 shares of his stock at private sale at $133, and returned all the certificates, with the request that Snowden have his signature to the transfer guaranteed by his bank. This was done by Snowden, who returned the certificates. On October 14th, Moore & Co. remitted their check to Snowden "to cover the 50 shares of Union Natural Gas stock purchased from you on the 11th inst.," and further wrote:

"It is probable that we will be in position to take the balance of this stock within the next day or so, and as we do I will remit to you."

The correspondence shows the money for the first 50 shares was forwarded and paid to Snowden. It also shows the second 50 was taken by Moore & Co. in the same way on the 15th of October, and a check for same forwarded to Snowden, dated October 25th, received and "placed to the credit of Mr. Snowden's account in his passbook." The proofs further showed the admission by the bank in its affidavit of defense:

"Defendant admits that John L. Moore & Co. delivered to it several certificates of stock in the Union Natural Gas Corporation, and requested the defendant to have the same transferred to the name of John L. Moore & Co."

Further oral proofs show that Snowden's certificates were brought by an officer of the bank to the Union Natural Gas Company, and new certificates were issued therefor to John L. Moore & Co. The stock represented by these certificates was subsequently sold by a broker at the request of the Marine National Bank, and certificates therefor issued to the purchasers, and the proceeds paid to the bank. All of these transactions happened on or prior to October 21st. There was proof, also, that the gas company, before it made stock transfers, required that signature of the owners whose signatures were not known

to be guaranteed by a bank John L. Moore, who was called by plaintiff, testified as follows:

"Q. When you say that you sometimes sold stock through the Marine National Bank, will you state just exactly what would occur at that time? A. First, I would request some one in authority there at the bank to dispose of certain shares of stock at certain prices, or at the market price, whatever the requirements might be in the case.

"Q. And when such sales were made, the proceeds were deposited, or what was done with the proceeds of the sales? A. Credited to our account."

The proof further showed the bank made no charge for such sales other than reimbursement for the commission paid to the broker who made the sale. The proofs further show Snowden was paid by Moore for the two lots of 50 shares first sold, a check on the Marine National Bank was sent him by Moore for the third 50, but the check went to protest, and for such third 50 and the fourth 50 he was never paid. Thereafter Snowden visited the bank and demanded a return of his stock and payment of the check, which was declined; the bank saying it did not have the stock and had no funds of Moore's to pay the check. Such were the proofs the plaintiff made to establish the tort.

But it is quite evident that the plaintiff, when his proofs were completed, wholly failed to sustain any element of the serious charges made in his statement. If Moore was guilty of any fraud in the general conduct of his business, no knowledge of the bank or collusion with him was shown. The bank had no dealings with Snowden, or no knowledge of any facts which raised any implied duty to him on its part. Moore was its customer; the bank at his request had sold stock to his account. In his customary way, he brought these certificates to the bank. They were indorsed in blank by the owner, and his signature was guaranteed by a bank. The bank had new certificates issued in the name of Moore & Co., and thereafter caused them to be sold. In thus selling the stock, the bank did exactly what Snowden had placed it in Moore's hands to do. In pursuance of Snowden's authorization, the bank sold the first 100, and Snowden was, in due course, paid the proceeds of such sale. Such being the case, wherein was the bank guilty of a tort in selling the second lot?

The proofs fail to show any tort of the bank in making the sale of the second 100, and the plaintiff simply did not, by his proofs, make good the allegations of tort on the bank's part, which constitutes a right of action in trespass. The testimony showing that the second 100 shares of the stock had been sold by the bank in the customary way, and the plaintiff having himself proved the bank's assertion that no proceeds of the sale were in its hands when his ownership of the certificates was for the first time brought to its notice, it is clear that no tort on the bank's part was proved, and to visit upon it the loss Snowden has sustained through Moore would be unjust, for it must not be overlooked that whatever wrong was effected was caused by Snowden placing in Moore's hands his certificates, with a certified signature, which put in Moore's power to do what he did. It follows, therefore, that the outcome of this case is in line with that just principle of jurisprudence that, where one of two innocent parties must suffer for

a wrong, the law places the damage on him who enabled a third party to do such wrong.

The judgment below is affirmed.